UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                             Case No. 97-CR-98

RANDALL MILLER,

    Defendant.

**UNITED STATES' RESPONSE IN OPPOSITION TO MOTION FOR COMPASSIONATE RELEASE PURUSANT TO 18 § 3582(c)(1)(A) AS AMENDED BY THE FIRST STEP ACT OF 2018**

The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Carol L. Kraft, Assistant United States Attorney, hereby responds to the defendant's motion for compassionate release. For the reasons set forth below, the motion should be denied.

**I.    Background**

On June 15, 2000, a jury convicted Randall Miller of four federal offenses. Count 1: Conducting the affairs of an enterprise, the Outlaw Motorcycle Club, through a pattern of racketeering (RICO), in violation of 18 U.S.C. § 1962(c); Count 2: Conspiracy to conduct the affairs of an enterprise, the Outlaw Motorcycle Club, through a pattern of racketeering (RICO conspiracy), in violation of 18 U.S.C. § 1962(d); Count 3: Conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 2; and Count 4: Conspiracy to possess with intent to distribute Hydrocodone, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 2.

1

CR. 1533.[1] Miller's RICO convictions were based on twelve proven racketeering acts including the murders of Donald Wagner, Morris and Ruth Gauger, and Michael Quale (Racketeering Acts 2, 4, and 13); attempted murder/conspiracy to commit murder of rival bikers, specifically members of the Hell's Angels, Hell's Henchmen, and their affiliate clubs (Racketeering Acts 1, 6, 7, and 9); robbery and assault of rival biker club members and associates (Racketeering Acts 5 and 8); cocaine and Hydrocodone trafficking (Racketeering Acts 23 and 24); and passing counterfeit United States currency (Racketeering Act 25). The criminal activity occurred during and as part of a violent gang war with rival motorcycle gangs over territory. *See,* Miller revised Presentence Report (PSR) 10/26/2000.

On October 12, 2000, this Court sentenced Miller to two concurrent life sentences on Counts 1 and 2, and two concurrent 240 month sentences on Counts 3 and 4, for a total sentence of life in prison. CR. 1689. The Court also imposed a total of 5 years of supervised release, ordered $350 in special assessments, a fine of $5,000, and restitution of $28,114.25. *Id.* Miller appealed his conviction and sentence to the Seventh Circuit Court of Appeals which docketed his case as USCA 00-3740. CR. 1703. Miller's conviction and sentence were affirmed in *United States v. Warneke*, 310 F.3d 542 (7th Cir. 2002).

Miller subsequently filed a *pro se* Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. 2255, alleging ineffective assistance of counsel. CV.1. This Court denied the motion and dismissed the petition with prejudice. CV. 6. The Court also denied Miller's motion for a certificate of appealability, which he unsuccessfully appealed to the Seventh Circuit. CV. 8, 10.

---

[1] In this response, CR. followed by a number refers to a docket entry on the district court record in Case No. 97-CR-98. CV. followed by a number refers to a docket entry on the district court record in Case No. 04-CV-494.

On January 9, 2017, Miller filed a *pro se* Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(2). CR. 2189. He contended that a reduction was authorized by Sentencing Guideline Amendment 782, which retroactively reduced drug amounts in the Sentencing Guidelines Drug Quantity and Chemical Table, U.S.S.G § 2D1.1. In light of this amendment, he asked the Court to treat his sentence as a package, to vacate his life sentence, and to reduce his total sentence to 240-300 months. *Id*. He represented himself to be a changed man who was suffering from a variety of physical ailments, including rheumatoid arthritis, heart problems, pain from his leg amputation, and borderline kidney disease. *Id*. at 4-5. He included copies of several medical reports,[2] a letter from a former employer who asserted that if Miller was released, he could be offered a job, and a letter from a current girlfriend who sought to confirm his status as a changed man. *Id*. The Federal Defender declined to submit a filing on Miller's behalf. CR. 2190. The probation department informed the Court that Miller didn't qualify for a sentence reduction because his highest adjusted offense level resulted from homicide, so that the drug guideline reduction did not serve to reduce his total offense level or affect his total sentence. CR. 2191. The Court found Miller to be ineligible for a sentence reduction and denied his motion. CR. 2192.

Miller is presently incarcerated at MCFP Springfield, a United States Medical Facility for Federal Prisoners in Springfield, Missouri. He has been in custody since May 1997, and accordingly, he has served approximately 22 ½ years of his total life sentence. On October 7, 2019, the Assistant Director/General Counsel denied Miller's request for a reduction of sentence (RIS) pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and PS 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A)

---

[2] Notably, these medical records did not include any diagnostic conclusions indicating untreatable medical conditions.

3

and 4205 (g), § 3(b) ("Debilitated Medical Condition"). *See*, Attachments 1 and 2. Now, in a filing that Miller labels as an appeal of that ruling, he asks this Court to reverse the decision of the Assistant Director/General Counsel and grant him a compassionate release. Miller fails to meet his burden of showing circumstances that meet the test for compassionate release. *See, United States v. Heromin,* 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019). Accordingly, his motion should be denied.

## II.     Legal Standard

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended on December 21, 2018 by Section 603(b) of the First Step Act, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of Title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the

4

defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[3]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," *and* the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. As potentially relevant to Miller,[4] the note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant.—
>
> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not

---

[3] Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

[4] Additional extraordinary and compelling conditions include age related physical/mental deterioration of defendants 65 or older, family circumstances, or other extraordinary and compelling reasons as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13 (B), (C) & (D). None of these are implicated by Miller's motion.

> > required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

For its part, consistent with note 1(D), the Bureau of Prisons (BOP) promulgated Program Statement 5050.50, amended effective January 17, 2019, to set forth its evaluation criteria. *See,* Attachment 2. Under these criteria, an inmate request for a motion under 18 U.S.C. § 3582(c)(1)(A) must first be submitted by the inmate to the Warden, in writing, stating that there are particularly extraordinary or compelling circumstances which could not have reasonably been foreseen by the court at the time of sentencing. The statement must include a description of the extraordinary or compelling circumstances that the inmate believes warrant consideration and a proposed release plan, including where the inmate will reside, how the inmate will support himself/herself, and if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment and how the inmate will pay for the treatment. *See* PS 5050.50 § 2 (a)(1) & (2). A request is considered submitted when it is received by the Warden. *Id.*

The Warden investigates the inmate's request and if the Warden denies the request for a motion for reduction of sentence based on extraordinary and compelling reasons, the inmate receives written notice and a statement of reasons, and may appeal the denial through the Administrative Remedy Procedure. PS 5050.50 §9 (a).

If the Warden determines that the request warrants approval, the Warden refers the matter, in writing, to the Office of the General Counsel. The list detailing the information that must be included in the referral to the General Counsel is extensive. It includes, but is not limited to, a comprehensive medical summary including pertinent medical records and test results, a copy of the inmate's presentence investigation, the views of the prosecuting attorney, input from victims, and a release plan. PS 5050.50 § 8(a)(1)(a-i).

If the inmate's request is denied by the General Counsel, the inmate receives notice and a statement of reasons. The denial is a final administrative decision, and is not appealable through the Administrative Remedy Procedure. PS 5050.50 § 9(b) and (d). If the General Counsel determines that inmate's request warrants approval, the General Counsel solicits the opinion of either the Medical Director or the Assistant Director, Correctional Programs Division depending upon the basis for the request. PS 5050.50 § 8 (a)(2). The entire matter is then forwarded to the Director of the Bureau of Prison for final decision. If granted, the Director of the Bureau of Prison contacts the United States Attorney in the district of sentencing, with a request that the United States Attorney file a motion to the sentencing court on behalf of the Director of the Bureau of Prisons, requesting a reduction of the inmate's sentence to time served. PS 5050.50 § 8(a (3).

All requests are assessed by the BOP using the factors that include the nature and circumstances of the inmate's offense; criminal history; comments from victims; unresolved detainers; supervised release violations; institutional adjustment; disciplinary infractions; personal history derived from the PSR; length of sentence and amount of time served, considered with respect to proximity to release date or Residential Reentry Center (RRC) or home confinement date; inmate's current age; inmate's age at the time of offense and sentencing; inmate's release plans (employment, medical, financial); and whether release would minimize the severity of the

offense. The factors are not exclusive nor weighted and the BOP is to consider whether the inmate's release would pose a danger to the safety of any other person or the community. PS 5050.50 § 7.

Prior to the passage of the First Step Act, the Court's consideration of a motion under § 3582(c)(1)(A), could only be the result of a presentation by the BOP. The First Step Act amendment added authority for an inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the Warden, whichever is earlier. In general, the defendant has the burden of showing circumstances meeting the test for compassionate release. *See United States v. Heromin,* 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019). As the terminology in the statute makes, clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at * 3 (D.N.M., June 7, 2019) (citations omitted).

**III.    Analysis**

On January 14, 2020, Miller filed the instant motion seeking a sentence reduction under 18 U.S.C. § 3582(c)(1)(A) as amended by the First Step Act. His motion, entitled "Appealing Denial Compassionate Release: 18 U.S.C. § 3582(c)(1)(A)," contends that he suffers from withering pain and a debilitating state of psychological, emotional, and physical deterioration. Specifically he points to rheumatoid arthritis, which he asserts affects his ability to use his hands, and to gastroesophageal disease which affects his ability to eat, with a resulting deleterious effect on his muscle strength and energy level. Additionally he contends that he suffers from sleep deprivation, depression, and cataracts and he references the amputation of his leg as a "nightmare that will follow him to his grave."

Although Miller claims his medical concerns are extraordinary and compelling, he attaches no medical documentation to support his motion, nor does he establish the date on which he submitted a request for compassionate release to the Warden, or establish that he has exhausted his administrative remedies within the prison, factual hurdles that trigger his right to directly seek relief from the Court under the First Step Act statutory amendment. Government counsel, however, has obtained a copy of the BOP General Counsel's decision denying Miller's request that the BOP file a motion for compassionate release on his behalf. The memorandum decision is dated October 7, 2019. *See,* Attachment 1. Since a request to the Warden triggers the process described in BOP's Program Statement 5050.50 (Attachment 2), it is clear that Miller's request to the Warden was necessarily more than 30 days prior to the instant filing. Additionally, since under BOP Program Statement 5050.50 §§ 9(b) and (d), General Counsel's denial is a final administrative decision that is not appealable through the Administrative Remedy Procedure, it appears that he has also met the statutory requirement that he exhaust his administrative remedies before seeking relief from the Court. Accordingly, under the requirements of amended 18 U.S.C. § 3582, it appears that Miller has standing to bring this motion.

That said, Miller has not met his burden of establishing that he is entitled to compassionate release. 18 U.S.C. § 3582, allows the court to reduce a term of imprisonment after considering the factors in § 3553(a) to the extent they are applicable, if the court finds that "extraordinary and compelling circumstances warrant such a reduction and the reduction is consistent with applicable policy statements issued by the sentencing commission 18 U.S.C § 3582(c)(1). The United States Sentencing Guidelines Manual provides that extraordinary and compelling reasons exist, as relevant to Miller, if the defendant is suffering from a terminal illness or a serious physical or medical condition, a serious functional or cognitive impairment, or deteriorating physical or

9

mental health because of the aging process, that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility, and from which he or she is not expected to recover. U.S.S.G. § 1B1.13, App. n. 1. *See also,* BOP PS 5050.50 § 3(a) and (b).

In his motion, Miller offers, at best, vague and conclusory statements about the state of his health, which are unsupported by any documentation and, further, he fails to establish that he suffers from a terminal illness, or that he is not expected to recover from the infirmities of which he complains. Of note in this regard is the BOP General Counsel's assessment. The General Counsel wrote:

> Mr. Miller, age 60, has a history of gastroesophageal reflux disease, rheumatoid arthritis, (RA) diagnosed in 2017, remote trauma to the right lower extremity leading to a below-the-knee amputation (BKA), and subsequent right above-the-knee amputation (AKA) in April 2019. After the BKA, Mr. Miller was able to ambulate with a prosthesis; however, with the recent AKA and RA, he is now primarily wheelchair bound and primarily relies on a pusher for mobility. He also requires assistance with transfers to and from his bed. Due to RA-related pain, he has been unable to participate in physical therapy for strength and balance training required for further prosthesis fitting and ambulation. He has been monitored by a rheumatologist, has tried Humira, Remicade, and Simponi, and is scheduled for a follow-up rheumatology evaluation. He is currently being treated with steroids and methotrexate, which is causing gastrointestinal intolerance and decreasing his appetite. Due to his need for assistance with the majority of his activities of daily living (ADLs) and instrumental ADLs, he was placed on the inpatient medical unit. He remains able to feed himself with setup, transfer, use the toilet and operate the telephone and computer.
> Mr. Miller's condition could improve with additional interventions. Specifically, with optimized treatment of his RA and pain, he could participate in the required PT and move toward becoming more independent with his ADLs and instrumental ADL. Accordingly, he does not meet the criteria for RIS under section 3(b) at this time, and his RIS is denied. He may submit a new RIS request if indicated following rheumatology consultations, medication adjustments, and PT as indicated.

In addition to failing to establish that his medical issues and circumstances constitute an extraordinary and compelling reason to grant him compassionate relief, Miller fails to establish that the § 3553 factors weigh in favor of his release. First, and perhaps most important in this

10

Case 2:97-cr-00098-JPS  Filed 02/05/20  Page 10 of 16  Document 2207

analysis, is the nature and circumstances of the offenses of conviction and his history and character. 18 U.S.C. § 3553(a)(1).

Miller's RICO convictions were based on twelve proven racketeering acts including nine that involved murders, attempted murders, the use of explosives, and violent assaults on members of rival motorcycle clubs, committed when he was a member of the Outlaws motorcycle club during and in furtherance of a gang war over territory. At trial, Miller, who was proved to be among the most violent of the charged defendants, was found to have caused the homicide death of Donald Wagner, who was lured to a remote location by Miller and Outlaw associates, and then executed by Miller, who shot him in the head with a .22 caliber pistol. The murder occurred over a load of marijuana. (Racketeering Act 2). Miller was also involved as a conspirator in the homicide death of Hell's Angel Michael Quale, who was stabbed to death at the Erie County, New York, Lancaster Speedway. At the behest of the Buffalo Outlaw chapter president, Miller and a mob of other Outlaws and Outlaw affiliates traveled to New York to assault and kill rival bikers. Armed with guns and knives and heavy duty flashlights wielded as clubs, they advanced in mass and attacked the rival bikers inside the speedway. During the melee, Miller severely beat one of the rival bikers while immediately adjacent to him, fellow Outlaw members stabbed Quale to death. (Racketeering Act 13). Finally and most horrific, were the homicides of Morris and Ruth Gauger, the elderly couple who operated a motorcycle parts business on their farm in McHenry County, Illinois. The trial evidence proved that Miller and a fellow Outlaw went to the Gaugers' farm to commit a robbery after Miller and another Outlaw had done previous surveillance on the property. Ultimately, after not finding the large sums of money that Miller thought would be secreted in the shop, Miller and his accomplice killed both Mr. and Mrs. Gauger. Miller personally slit Mr. Gauger's throat and left him to bleed to death on

11

the floor of his shop. Mrs. Gauger was killed by Miller's companion, and also left to die on the floor of the small rug and trinket shop she operated on the farm. Miller showed no compassion for either of these elderly people who were intentionally killed over what amounted to a small amount of pocket change. Nor did he show any compassion for the Gaugers' adult son, who, following their murders, was wrongfully arrested for his parents' deaths, and based on a coerced false confession, was convicted and sentenced to death. The son's case was only dismissed after the true facts of the crime were revealed by Miller's accomplice who pled guilty and testified against Miller at the RICO trial. (Racketeering Act 4).

In addition to these murders, Miller was directly involved in attempts on the lives of others. As part of the Outlaws gang war, Miller placed and detonated an explosive on a truck owned by Patrick Matter, then the president of the Minneapolis Hell's Angel chapter. The explosive destroyed the truck but caused no injury to Matter who was not near the vehicle when the explosive was detonated. (Racketeering Act 7). Miller affixed an explosive device to the underside of a truck owned by Hell's Henchmen member Eddie Murphy who discovered and removed the device before it caused any injury or damage. Later, Miller and two Outlaw companions followed-up their attempt to injure Murphy by running his vehicle off the road and attempting to force him into their van, where police who had arrived and intervened, found a loaded handgun, handcuffs, and a rolled up rug. (Racketeering Act 6). Miller placed an explosive device at the door of the Hell's Henchmen Clubhouse in Rockford, Illinois, which ultimately caused permanent hearing loss to a bomb squad officer who responded to deactivate the bomb. (Racketeering Act 1). Miller beat and stripped the colors from an east coast Hell's Angel member who had stopped at a Janesville bar on his way to the motorcycle event at Sturgis, South Dakota. (Racketeering Act 5). Miller pistol whipped and broke the nose of a female bartender

12

during an assault and robbery at JR's Tavern in Calumet City, Illinois, as his fellow Outlaws ordered patrons to the floor, broke glassware, and fired shots inside the bar, including one that shattered the television. The massive attack, which involved a mob of Outlaw members and associates from various chapters, was intended to intimidate the bar owners so that they would no longer cater to rival bikers. (Racketeering Act 8). Finally, Miller participated in hunting trips, wherein groups of Outlaws looked for rival bikers to attack, including the Tuesday night Hell's Henchmen hunt, where the Outlaw members planned but failed at an effort to shoot into the pack of rival bikers with the intent of causing the entire line of riders to crash, thereby injuring themselves and damaging their motorcycles. (Racketeering Act 9). Additionally, there are the two drug trafficking and one counterfeit currency offenses, serious in and of themselves. (Racketeering Acts 23, 24 and 25).

In sum, the RICO offenses, and the underlying predicates for which Miller was convicted were extremely serious, arguably among the most serious ever litigated in this district. Moreover, the gravity of Miller's crimes is compounded by the fact that he was then already a seasoned criminal. Miller's criminal history included convictions for burglary, reckless use of a weapon, transportation of a short barreled shotgun, felon in possession of a firearm, disorderly conduct, operating while intoxicated, carrying a concealed weapon, possession of marijuana, possession of Diazepam, bail jumping, possession of cocaine, and obstructing. See PSR, 44-50. Moreover, at the time that he engaged in this gang war and committed the offenses that served as predicates in the federal RICO case, Miller was on probation for convictions in both Milwaukee and Kenosha Counties, and, subsequent to his arrest, but prior to his sentencing, was charged in Walworth County Circuit Court with two additional separate cases involving bail jumping and marijuana possession, and burglary and theft of movable property. PSR 50-51. In light of the foregoing, the

13

total life sentence that the Court imposed when sentencing Miller in the fall of 2000, was clearly supported by all of the relevant section 3553 factors: the nature and circumstance of the offenses and the history and characteristics of the defendant 18 U.S.C. § 3553 (a)(1); the need for the sentence imposed to reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for the offenses, 18 U.S.C. § 3553 (a)(2)(A); the need for the sentence to provide adequate (both specific and general) deterrence for the criminal conduct, 18 U.S.C. § 3553 (a)(2)(B); the need for the sentence to protect the public from further crimes of the defendant, 18 U.S.C. § 3553 (a)(2)(C); and the need for the sentence to provide the defendant with correctional treatment in the most effective manner, 18 U.S.C. § 3553 (a) (2) (D). Miller's total life sentence was fair, just, and reasonable when it was imposed and remains fair, just, and reasonable today.

It is hard to know definitively, the degree to which Miller continues to represent a danger to others or the community at large, particularly in light of his age and admittedly diminished physical abilities. And, we have no information about his current relationship with his former Outlaw associates or how that relationship might relate to his potential to pose a danger to others, notwithstanding his assertions that he is a changed person. However, in light of the serious nature of Miller's offenses of conviction and his criminal history, the Court cannot be assured that he now poses no danger to the community. Moreover, a reduction of his sentence to time served with supervised release would surely depreciate the seriousness of these offenses and deprive his victims and their families of any sense that Miller received just punishment for his crimes.

Finally, considering Miller's apparent need for some medical care, it seems clear that he is receiving more than adequate care within the prison setting. General Counsel's Memorandum reflects that Miller has been placed in an inpatient unit, is receiving rheumatology consultations,

14

medication adjustments, and PT as indicated. Indeed, he may well be receiving better treatment within the prison than he would be able to obtain outside.

## IV. Conclusion

Based on the foregoing, the Court should find that Miller has not demonstrated that his health circumstances establish an extraordinary and compelling reason to grant him a compassionate care release, and that the § 3553 factors, in particular the serious nature of his criminal conduct, weigh against any compassionate release under 18 U.S.C. § 3582. His motion should be denied.

Dated February 5, 2020 at Milwaukee, Wisconsin.

Respectfully submitted,

MATTHEW D. KRUEGER
United States Attorney

By:

s/*Carol L. Kraft*
CAROL L. KRAFT, WSB # 1000117
Assistant United States Attorney
517 East Wisconsin Avenue, # 530
Milwaukee, WI 53202
Telephone: 414 297-1706
Fax: 414 297-1738
Email: carol.kraft@usdoj.gov