| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RANDALL E. MILLER,<br><br>Defendant. | Case No. 97-CR-98-13-JPS<br><br><br>**ORDER** |

1. **BACKGROUND**

On January 14, 2020, Defendant Randall E. Miller filed a motion for compassionate release. (Docket #2205). The Government responded to this motion, and Federal Defender Services of Wisconsin, Inc. ("FDS") submitted a supplement in support of Defendant's motion. (Docket #2207, #2232). Thereafter, the parties engaged in additional briefing on this matter, and FDS filed a second motion for compassionate release. (Docket #2240). Based on the facts and arguments submitted to the Court, the Court finds that there is sufficient record on which it may deny Defendant's motions.

2. **FACTS**

   2.1 **Criminal History**

On June 15, 2000, a jury convicted Defendant of four federal offenses: Count One, conducting the affairs of an enterprise, the Outlaw Motorcycle Club (the "Outlaws"), through a pattern of racketeering, in violation of 18 U.S.C. § 1962(c); Count Two, conspiracy to conduct the affairs of the Outlaws through a pattern of racketeering, in violation of 18 U.S.C. § 1962(d); Count Three, conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 2; and Count Four,

conspiracy to possess with intent to distribute hydrocodone, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 2. (Docket #2207 at 1).

Defendant's RICO convictions were based on twelve proven racketeering acts, including three murders, various attempted murders/conspiracies to commit murder of rival bikers, robbery and assault of rival biker club members and associates, cocaine and hydrocodone trafficking, and dealing in counterfeit United States currency. (*Id.* at 2). The criminal activity occurred during and as part of a violent gang war with rival motorcycle gangs over territory. (*Id.*)

On October 12, 2000, this Court sentenced Defendant to two concurrent life sentences on Counts One and Two, and two concurrent 240-month sentences on Counts Three and Four, for a total sentence of life in prison. (*Id.*) The Court also imposed a total of 5 years of supervised release, as well as ordered $350.00 in special assessments, a fine of $5,000.00, and restitution of $28,114.25. (*Id.*) During the sentencing hearing, the Court made the following remarks about Defendant and the brutality of his crimes:

> Well, Mr. Miller, I too can add very little to this incredible series of, as I have repeatedly described them, barbaric acts . . . . [H]ow is it that each of you became so disconnected from the mainstream of society, including your families, I don't know how you could go home or participate in a family event knowing some of the things that you and your fellow Outlaw club members were doing on a repeated basis.
>
> . . . .
>
> And so the [C]ourt is left to apply the sentencing guidelines which Congress has mandated be applicable . . . . And although I do not have the authority in the context of this case to impose something other than a life sentence, the facts certainly cry out for something more if it were available.

(Docket #1921 at 46–48).

Page 2 of 15
Case 2:97-cr-00098-JPS   Filed 02/14/22   Page 2 of 15   Document 2276

Defendant appealed his conviction and sentence to the Seventh Circuit Court of Appeals; the appellate court affirmed both. *United States v. Warneke*, 310 F.3d 542 (7th Cir. 2002). Defendant filed a pro se motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, alleging ineffective assistance of counsel. (Docket #2207 at 2). This Court denied the motion and dismissed the action with prejudice; the Seventh Circuit affirmed that decision. Defendant has also previously filed a motion for compassionate release, citing changes in the sentencing guidelines. (Docket #2189). The Court found Defendant to be ineligible for a sentence reduction and denied his motion. (Docket #2192). Defendant has been in custody since 1997, and, accordingly, he has served approximately 24 years of his total life sentence. (Docket #2207 at 3).

### 2.2 Medical History

While serving his sentence, Defendant's health has drastically deteriorated. Defendant is presently incarcerated at Federal Medical Center Rochester, but he was previously housed at MCFP Springfield, a United States Medical Facility for Federal Prisoners in Springfield, Missouri. (Docket #2232 at 9). MCFP Springfield is a long-term care unit and one of the BOP's few level 4 facilities. (*Id.*) These facilities are reserved for inmates with the most significant medical conditions—those whose functioning may be so severely impaired as to require 24-hour skilled nursing care or nursing assistance. (*Id.*) (quotations omitted). Defendant, through his counsel, has summarized over 1,000 pages of medical history for the Court:

> First, [Defendant] suffers from a variety of heart problems, including cardiomyopathy, heart failure, and valvular heart disease . . . . Second, [Defendant] suffers from lung disease including pleural effusion, a buildup of fluid around the lungs. This requires him to be on oxygen . . . . Third, [Defendant] suffers from immunosuppression. [Defendant]

> currently takes multiple treatments to address his rheumatoid arthritis: Prednisone (a steroid), Methotrexate (a chemotherapy), and Rituximab. Each of these individually suppresses a person's immune system.
>
> . . . .
>
> Physically, [Defendant] is a shell of the person who committed these awful and violent crimes decades ago. In addition to the medical conditions described above, he's had two right leg amputations. He is confined to an electric wheelchair . . . . Because of his rheumatoid arthritis, and the pain in his remaining leg, he can no longer use a prosthesis. When he tries to put any pressure on his left leg, the pain is so great [Defendant] urinates himself. He sleeps in a hospital bed in a unit of inmates that would fit in better in an ICU than a prison. To combat the pain, he's given pain medication and steroids. So in addition to the constant pain, [Defendant] also suffers from constant nausea. He is prescribed 27 medications. He has such little feeling in his hands that he needs help with the most basic chores like holding utensils to eat and brushing his teeth. He is losing his eyesight. He urinates into a handheld urinal, which a nurse attendant later dumps into the toilet. He needs help getting in and out of bed (where he spends most of his time) . . . . And notably, these aren't conditions that are going to improve. So this is [Defendant's] new normal.

(Docket #2232 at 9–10, 13–14).

Based on medical recommendation, Defendant has not been vaccinated against COVID-19. (Docket #2260 at 1). "Due to the chemotherapy treatments to treat his rheumatoid arthritis and the fact that there have been reports of rheumatoid arthiritis [sic] complications in those who have received the vaccine, the medical staff . . . believe[] that [Defendant] needs to consult with a rheumatologist before getting the COVID vaccine." (*Id.*) On February 7, 2022, Defendant tested positive for COVID-19. (Docket #2272). His heart health has also worsened. (Docket #2263 at 1).

### 2.3 Defendant's Character and Release Plan

Defendant provides the Court with details about his character growth since being incarcerated. Defendant retired from the Outlaws early in his prison sentence. (Docket #2232 at 14). He has incurred only three minor prison-policy violations in over 20 years. (*Id.*) According to Defendant, in 2003, he "turned [his] life over to God, and [hasn't looked] back." (*Id.*) In 2012, Defendant began working as a volunteer in MCFP Springfield's Inmate Companion Program, where he assisted other inmates in day-to-day hygiene. (*Id.*) The Court has received letters from two BOP employees who vouch for Defendant's well-improved character, abstention from violence, and acceptance of responsibility. (Docket #2209, #2211). As part of his volunteer work, Defendant has sat with dying inmates and interacted with them in their last days and hours. (Docket #2232 at 16). Defendant views his volunteerism as a way of making amends. (Docket #2232-4).

If released, Defendant plans to live in New Jersey with his niece. Defendant states the following about his release plan,

> [Defendant] will be far away from the people he associated with before going to prison and he'll be subject to home confinement. [His niece] will be able to provide [Defendant] the care he needs until he receives a home health care aid. The local hospital and medical center is five minutes from her home. [His niece] is also able to assist financially. Also, as indicated in the letters from [Defendant's] ex-wife and brother, he will have additional support from a small group of people who will surely hold him to high standards.

(Docket #2232 at 18).

3.  **LEGAL STANDARD**

The Court can modify a term of imprisonment "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or thirty days after the warden at the defendant's facility has received such a request for release, "whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). There must also be "extraordinary and compelling reasons warrant[ing] such a reduction[.]" *Id.* § 3582(c)(1)(A)(i).

While § 3582(c)(1)(A) instructs that a reduction must also be "consistent with applicable policy statements issued by the [United States] Sentencing Commission," this circuit recently held that the relevant policy statement, U.S.S.G. § 1B1.13, is inapplicable to prisoner-initiated motions for compassionate release. *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). Therefore, a court has discretion when determining what constitutes an "extraordinary and compelling" reason warranting compassionate release. *Id.* ("[T]he trailing paragraph of § 3582(c)(1)(A) does not curtail a district judge's discretion. Any decision is 'consistent with' a nonexistent policy statement."). A district court may also "make the same determinations that would normally be left to the Director of the Bureau of Prisons [under the catchall provision at U.S.S.G. § 1B1.13 n.1(D)]." *United States v. Brown*, Case No. 01-CR-196-JPS, 2020 WL 4569289, at *4 (E.D. Wis. Aug. 7, 2020). Yet, this Court will evaluate prisoner-initiated motions for compassionate release with due regard for the guidance provided in § 1B1.13 because it "provide[s] a working definition of 'extraordinary and compelling reasons' . . . [which] can guide discretion without being conclusive." *Gunn*, 980 F.3d at 1180; *see also United States v. Mays*, Case No. 1:08-cr-00125-TWP-DML, 2020 WL 7239530, at *3 (S.D. Ind. Dec. 9, 2020)

(evaluating compassionate motions brought under the "extraordinary and compelling" prong of § 3582(c)(1)(A) with "due regard" for § 1B1.13).

The commentary to the Sentencing Guidelines explains that "extraordinary and compelling reasons exist" when "[t]he defendant is suffering from a terminal illness, (i.e., a serious and advanced illness with an end of life trajectory)," such as cancer or advanced dementia. U.S.S.G. § 1B1.13 n.1.(A)(i). The commentary also considers a defendant's medical condition to be an extraordinary and compelling reason if:

> [t]he defendant is suffering from a serious physical or mental condition, suffering from a serious functional or cognitive impairment, or experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* § 1B1.13 n.1.(A)(ii).

The Court will also consider whether "the defendant is not a danger" to others or the community, as provided in 18 U.S.C. § 3142(g). *Id.* § 1B1.13(B)(2).

Prior to modifying a term of imprisonment, the Court must also consider the sentencing factors set forth in 18 U.S.C. § 3553(a), if applicable. 18 U.S.C. § 3582(c)(1)(A). Pursuant to § 3553(a), when determining the sentence to be imposed, the Court shall consider, among other things: the nature and circumstances of the offense; the defendant's history and characteristics; and the need for the sentence to (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (2) afford adequate deterrence, (3) protect the public, and (4) provide the defendant with effective training, care, and/or treatment.

## 4. ANALYSIS

### 4.1 Exhaustion

After Defendant filed his pro se motion, the Government initially conceded that Defendant exhausted his administrative remedies. (Docket #2207 at 9); *see Gunn*, 980 F.3d at 1179 ("Failure to exhaust administrative remedies is an affirmative defense, not a jurisdictional issue that the court must reach even if the litigants elect not to raise it.") (internal citations omitted). However, after FDS intervened in this matter and raised, for the first time, the effects of the COVID-19 pandemic on Defendant's motion, the Government took the position that Defendant had not exhausted his administrative remedies:

> [Defendant's] request to the Warden did not claim, as his supplemental motion does now, that immunosuppression with two drugs, cardiac disease, including heart failure and valvular disease, and lung disease requiring nocturnal supplemental oxygen are underlying medical conditions that coupled with the COVID-19 pandemic and his rehabilitation constitute extraordinary and compelling reasons for his compassionate release. In other words, these are new claims. Because [Defendant] never presented his current request to the Warden, the BOP has been unable to undertake an assessment regarding the merit of the claims . . . . Accordingly . . . the Court should deny without prejudice, the supplemental motion insofar as it is based on new health claims that were not previously made in his request to the Warden.

(Docket #2233 at 4–5).

As Defendant discusses, many of the courts that have considered this argument have rejected it. *See, e.g.*, *United States v. Torres*, 464 F. Supp. 3d 651, 655 (S.D.N.Y. 2020). But, in February 2021, the Seventh Circuit agreed with the Government's argument: "In our view, § 3582(c)(1)(A)'s

exhaustion requirement more closely resembles the exhaustion requirement in the Prison Litigation Reform Act . . . . That Act requires 'proper exhaustion' of available administrative remedies in order to afford prisons an opportunity to address issues before they are brought to federal court." *United States v. Williams*, 987 F.3d 700, 703 (7th Cir. 2021). In the case before it, which closely resembles the case before this Court, the Seventh Circuit held that "because [the defendant] never asked the [BOP] to move the district court for his release based on the presence of COVID-19 at his prison and his risk of infection, his counsel could not properly file a motion for compassionate release on that basis." *Id.*

In his arguments on exhaustion (which Defendant submitted prior to the *Williams* decision), Defendant also informed the Court that, "[o]ut of an abundance of caution, after receiving the [G]overnment's response, [Defendant] submitted a second administrative request for compassionate release," this time addressing the risks posed by COVID-19. (Docket #2235 at 5). In the context of motions brought under § 3582(c)(1)(A), the Court is unable to find directly on-point case law as to whether a defendant can satisfy the exhaustion requirement *after* filing his federal motion. But, given that the Seventh Circuit has instructed that the exhaustion requirement under § 3582(c)(1)(A) be construed similarly to that under the Prison Litigation Reform Act, *Williams*, 987 F.3d at 703, it appears that a § 3582(c)(1)(A) motion must be denied "even if the plaintiff exhausts his administrative remedies while the litigation is pending." *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004) (citing *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999); *see also United States v. Cavins*, No. 11-CR-40064-JPG, 2020 WL 4814670, at *2 (S.D. Ill. Aug. 19, 2020) (citing *Perez*, 182 F.3d at 535) ("The Court is sympathetic to the defendant in that the 30 days have now

passed so the Court should entertain his motion [for compassionate release], but Congress has not authorized the Court to do this, opting instead to give the BOP 30 days exclusively to consider an inmate's request before the inmate can file his own motion.").

However, after the Seventh Circuit issued its decision in *Williams*, and after exhausting his administrative remedies as to the effects of COVID-19, Defendant filed a second motion for compassionate release, incorporating, by reference, all earlier pleadings. (Docket #2240). The Government did not oppose this attempt. Accordingly, the Court finds that Defendant has exhausted his administrative remedies as to the risks posed by COVID-19 and will treat Defendant's second motion for compassionate release as the operative motion and allow him to incorporate all earlier pleadings by reference.

### 4.2 Extraordinary and Compelling Circumstances

The briefing in this matter provides evidence that, regardless of any global pandemic, Defendant is a very sick, aging man. Because of his various conditions—including his leg amputations, rheumatoid arthritis, pain, gastro-esophageal reflux disease, the side effects of his many medications, and nausea—he struggles with nearly all of his basic, daily functions. And the COVID-19 pandemic has increased Defendant's risks of serious health complications. Importantly, based on medical opinions, Defendant is a poor candidate for the vaccine against COVID-19. Even the Government concedes that many of Defendant's conditions fall within the categories of health issues that the Center for Disease Control identifies as those that raise the risk of serious illness from COVID-19. (Docket #2233 at 9); *see also United States v. Gonzales*, Case No. 13-CR-101-JPS, 2020 WL 4437154, at *4 (E.D. Wis. Aug. 3, 2020) (noting that the outbreak of COVID-

19, together with underlying medical conditions that place a defendant at "high risk" should he contract the disease, may establish an extraordinary and compelling reason warranting release).

However, more practically, Defendant has provided a release plan that inspires little confidence. His plan to move to New Jersey to live with his niece, receive assistance from his ex-wife, and hopefully obtain an at-home healthcare aid is aspirational at best. "[A] common sense reading of the compassionate release statute compels the obvious: compassionate release due to medical conditions, alone or in combination with the COVID-19 pandemic, makes little sense if the defendant would not in fact receive better medical care outside of prison." *United States v. Marquez*, No. 1:13-CR-00431 WBS, 2021 WL 736294, at *1 (E.D. Cal. Feb. 25, 2021). Presently, Defendant is housed in a federal medical center where he receives around-the-clock care and assistance with his daily functions. (*See* Docket #2233 at 7–8). He has not provided moving argument or evidence that he will receive better care outside of a custodial sentence. *See United States v. Vasser*, No. 8:17-CR-276, 2021 WL 843420, at *2 (D. Neb. Mar. 4, 2021) ("Finally, although Defendant's injuries and pain from his fall are severe, no evidence suggests . . . that he would receive better care outside prison. To the contrary, the evidence suggests that he is receiving regular care for his injuries."). This cuts heavily against the Court finding that Defendant has presented an extraordinary and compelling reason warranting his early release. The Court need not reach a conclusive answer on this issue, however, as Defendant's motion fails in the Court's analysis of the § 3553(a) factors.

### 4.3 The § 3553(a) Factors

Defendant's release turns on the Court's application of the sentencing factors to Defendant's present state. At the time of his sentence, the total life sentence that the Court imposed was clearly supported by all of the relevant § 3553 factors: the nature and circumstance of the offenses and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for the offenses; the need for the sentence to provide adequate (both specific and general) deterrence for the criminal conduct; the need for the sentence to protect the public from further crimes of the defendant; and the need for the sentence to provide the defendant with correctional treatment in the most effective manner. But, at this juncture, the Court cannot ignore the improvements Defendant has made on himself and the changes in his life's circumstances.

Almost 30 years have passed since Defendant's crimes. His health is failing him—he is wheelchair bound and can barely function to tend to his hygiene needs on his own. Physically, Defendant poses no threat to the public. Defendant has also demonstrated a renouncement of violence. He has had only three minor violations of prison policy in his two-and-a-half decades of incarceration. His volunteer work within MCFP Springfield— and his reasons for doing such work—reflects well on his changed character and willingness to serve rather than harm his community. Certainly, as one court recently noted in granting compassionate release to a person serving a life sentence, "[o]ur country's criminal justice system is premised on the idea that a person can—and hopefully will—change after several years locked in prison." *United States v. Ledezma-Rodriguez*, No. 3:00-CR-00071, 2020 WL 3971517, at *6 (S.D. Iowa July 14, 2020).

Countervailing these improvements, however, is the fact that Defendant is serving a life sentence for *violent* crimes. His RICO convictions were based on twelve proven racketeering acts, including nine that involved murders, attempted murders, the use of explosives, and violent assaults on members of rival motorcycle clubs, all of which were committed when he was a member of the Outlaws motorcycle club during and in furtherance of a gang war over territory. At trial, Defendant, who was proved to be among the most violent of the charged defendants, was found to have caused the killing of Donald Wagner, who was lured to a remote location by Defendant and Outlaw associates and then executed by Defendant, who shot him in the head with a .22 caliber pistol. The murder occurred because of a load of marijuana. The other murderous instances involved stabbings and beatings. Finally (and most horrifically), were the homicides of Morris and Ruth Gauger, an elderly couple who operated a motorcycle-parts business on their farm in McHenry County, Illinois. The trial evidence proved that Defendant and a fellow Outlaw went to the Gaugers' farm to commit a robbery. Ultimately, after not finding the large sums of money that Defendant thought would be secreted in the shop, Defendant and his accomplice killed both Mr. and Mrs. Gauger. Defendant personally slit Mr. Gauger's throat and left him to bleed to death on the floor of his shop. The Gauger's adult son was tried, convicted, and sentenced to death for the murder of his parents. He was exonerated only after one of Defendant's associates admitted to the crime.

The crimes remaining on Defendant's list of convictions include various other failed efforts to end the lives of those who posed a threat to his criminal enterprise and those unassuming citizens who got in his way. Moreover, at the time that he engaged in this gang war and committed the

offenses that served as predicates in the federal RICO case, Defendant was on probation for convictions in both Milwaukee and Kenosha Counties; and, after his arrest, but prior to his sentencing, Defendant was charged in Walworth County Circuit Court with two additional, separate cases involving bail jumping, marijuana possession, and burglary and theft of movable property.

The severity of Defendant's crimes overwhelms the analysis in this case. Defendant was among the most violent of the Outlaw members who engaged in an extensive gang war that was fueled by jealous rivalry and executed with firearms and explosives. Defendant's change of heart and mind is laudable, but it cannot erase the enormity of his crimes or the depth of the harm that he has caused to others. The § 3553(a) factors counsel against Defendant's early release.[1]

5. **CONCLUSION**

Our criminal justice system has the capacity for—indeed the goal to promote—remorse and compassion. But healing requires time and adequately served punishment. Perhaps this case will one day be ripe for compassionate release, but 24 years is not yet sufficient time for the community's hurt from Defendant's actions to be healed by his punishment and outweighed by his failing health. Defendant is receiving adequate care in prison for his health needs. The Court must deny without prejudice Defendant's second motion for compassionate relief, (Docket #2240), and

---

[1] Defendant also argues that he should be released because some of his codefendants have been released or received shorter sentences. (Docket #2232). Many of these cases are sealed. The Court will say nothing other to note that their comparisons to the present case are inapposite and based on incomparable circumstances.

will deny as moot Defendant's first motion for compassionate release, (Docket #2205).

The Court will grant the pending motions to seal, (Docket #2231, #2259, #2262), as the underlying documents contain sensitive medical records.

Accordingly,

**IT IS ORDERED** that Defendant Randall E. Miller's first motion for compassionate release (Docket #2205) be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Defendant Randall E. Miller's second motion for compassionate release (Docket #2240) be and the same is hereby **DENIED without prejudice**; and

**IT IS FURTHER ORDERED** that Defendant's motions to seal (Docket #2231, #2259, #2262) be and the same are hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 14th day of February, 2022.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge